UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                              :

GLENIS CHIN-McKENZIE,                    :

                           Plaintiff,       :               10 Civ. 3658 (PAE)

                  -v-               :           OPINION & ORDER

                                        :

CONTINUUM HEALTH PARTNERS et al.,     :

                                        :

                           Defendants.      :

                                        :
------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

      Defendants Continuum Health Partners, Inc. ("Continuum") and Long Island College

Hospital "("LICH") move for summary judgment against the Complaint of Glenis Chin-

McKenzie, which claims sexual harassment and retaliation in violation of Title VII of the Civil

Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2, and discrimination on the basis of

disability, in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §

12101 *et seq.* For the following reasons, defendants' motion is granted in part and denied in part.

## I.    Undisputed Facts

      The parties agree on the facts of this case: Plaintiff, who is counseled, did not rebut any

of the undisputed facts set forth in defendants' Rule 56.1 statement, and a failure to respond to an

adversary's Rule 56.1 statement admits all facts claimed therein. *See Amnesty Int'l USA v.*

*Clapper*, 638 F.3d 118, 129 n.13 (2d Cir. 2011), *reh'g denied*, 667 F.3d 163, *cert. granted*, 182

L. Ed. 2d 1061 (2012) (citing *Gubitosi v. Kapica*, 154 F.3d 30, 31 n.1 (2d Cir. 1998)); *see also*

S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set

forth in the statement required to be served by the moving party will be deemed to be admitted

for purposes of the motion unless specifically controverted by a correspondingly numbered

paragraph in the statement required to be served by the opposing party").  The undisputed facts are as follows:[1]

On March 13, 2006, LICH hired Chin-McKenzie as a dispatcher in the hospital's engineering department.  56.1 ¶ 8.  In that role, Chin-McKenzie answered telephone calls notifying the department of necessary repairs or maintenance work within LICH, identified the relevant engineer on duty to perform the task, issued work orders to the relevant engineer, maintained a logbook of the department's responses to service calls, monitored the time taken on various projects, and prepared quarterly activity reports on the department's activity for senior management.  *Id.* ¶ 9.  Chin-McKenzie handled more than 1,000 calls each month in her position as dispatcher; she was LICH's sole dispatcher.  *Id.* ¶¶ 10–11.

On March 20, 2006, Chin-McKenzie attended a day-long orientation for new employees. *Id.* ¶¶ 13, 19.  During that session, Norman Werner, a corporate compliance officer from Continuum, trained the new employees on LICH's corporate compliance program.  *Id.* ¶ 13.  The program reviewed LICH's code of conduct and its prohibitions on discrimination, harassment, and retaliation.  *Id.* ¶ 14.[2]  As part of that presentation, Werner offered hypothetical workplace scenarios to illustrate employees' duties under both LICH policies and applicable law; one such scenario addressed sexual harassment.  *Id.* ¶ 17.  Werner also gave out LICH's hotline telephone

---

[1] The Court's account of the facts is drawn from defendants' Rule 56.1 statement (the "56.1") (Dkt. 27), which itself draws upon the declarations of Raffaele Gambardella, Jeffrey Karp, Debra Salliey, and Norman Werner, each with attached exhibits.  The 56.1 also draws upon the Affidavit of David R. Marshall, defendants' counsel, which is a transmittal affidavit attaching records of Continuum and LICH, and excerpts of deposition transcripts, including Chin-McKenzie's ("Dep. Tr.").  Except where a declarant's identity is relevant (*e.g.*, it corroborates personal knowledge of a particular event), the Court will refer solely to the 56.1 statement.

[2] Hard copies of the relevant LICH policies were given to the employees at the time of hiring. Employees who forgot to bring their copies to the training session were furnished additional copies.  *Id.* ¶ 15.

number, to which employees were encouraged to anonymously report behavior violating LICH policy and/or the law.  *Id.* ¶ 18.

A.      **Chin-McKenzie's Complaint of Sexual Harassment**

On October 7, 2008, Chin-McKenzie complained by letter to LICH's human resources department ("HR") that a male supervisor in the engineering department had sexually harassed her.  *Id.* ¶ 20.  Chin-McKenzie's letter described three incidents with the supervisor:  one on May 15, 2008 and two on September 29, 2008.  *Id.* ¶ 21.  Each involved suggestive and/or innuendo-laden verbal comments; one involved non-sexual touching.  *Id.*  As described by Chin-McKenzie, the supervisor did not hurt her or touch her sexually; nor did he ask her for a private rendezvous, or seek sexual favors as a "quid pro quo."  *Id.* ¶¶ 24–26.  Following these incidents, Chin-McKenzie did not take time off from work or seek medical treatment.  *Id.* ¶ 23.

Immediately after Chin-McKenzie's complaint, HR initiated an investigation of her allegations.  *Id.* ¶ 29.  On October 10, 2008, three days after Chin-McKenzie's letter, LICH terminated the supervisor as a result of the investigation.  *Id.* ¶ 30.  Following the termination, Chin-McKenzie did not experience any other sexual harassment at LICH.  *Id.* ¶ 34.

B.      **Chin-McKenzie's Allergic Reactions and LICH's Response**

Since at least 2002, Chin-McKenzie has suffered from allergic reactions to certain food products and various species of pollen.  *Id.* ¶ 35.  She believes that certain chemical odors exacerbate her allergic reactions.  *Id.* ¶36.  During her previous employment at the engineering department of St. Mary's Hospital, her allergies did not require accommodation, although one episode resulted in a visit to the hospital's emergency room.  *Id.* ¶ 37.

Although Chin-McKenzie's allergic episodes at LICH pre-dated the alleged incidents of sexual harassment, she believes that the trauma from those events in 2008 worsened her allergic

[3]

reactions.  *Id.* ¶¶ 39–40.  When Chin-McKenzie had allergic episodes while working, she was either escorted or taken to the Emergency Department ("ED") or Employee Health Service ("EHS").  *Id.* ¶ 41.  Often, following these episodes, Chin-McKenzie was sent home for the rest of the day by the attending physician at the ED or EHS; several times, she stayed home for an additional day or more.  *Id.* ¶ 43.  In Chin-McKenzie's absence, some maintenance calls to the engineering department, including emergency calls, went unanswered; others were handled less promptly than by Chin-McKenzie  *Id.* ¶ 44.

In or about mid-2008, Chin-McKenzie lodged a complaint regarding her treatment as a patient in the ED.  *Id.* ¶ 45.  Later, in November 2008, her supervisors told her that, henceforth, she would have to comply with the newly-enforced LICH policy, under which a supervisor must refer an ill employee to the EHS or ED.  *Id.* ¶¶ 45–48.

In November 2008, Chin-McKenzie suffered three episodes of severe allergic reactions within a 10-day span.  *Id.* ¶ 50.  On Friday, November 7, 2008 she suffered a reaction which she believed was caused by Endust, a cleaning product.  She was told to go to the EHS in accordance with LICH policy, but instead phoned the EHS and then proceeded directly to the ED.  *Id.*  On Monday, November 10, 2008, she suffered another episode (allegedly due to the lingering smell of Endust near her office); she went to EHS but then demanded to be treated in the ED.  *Id.* ¶ 51.  Chin-McKenzie was out of work for the remainder of the week thereafter.  *Id.*  On Monday, November 17, 2008, she reported to work, but claimed to feel another episode coming on.  *Id.* ¶ 52.  Without notifying her managers or EHS, Chin-McKenzie left her office during working hours to walk around the neighborhood and get fresh air.  *Id.*  Because Chin-McKenzie did not inform her supervisors before leaving work, or proceed to EHS, her supervisor generated a

[4]

memorandum memorializing the incident, and admonishing Chin-McKenzie henceforth to comply with LICH procedures. *Id.* ¶ 53.

On December 4, 2008, LICH convened a meeting with Chin-McKenzie, engineering department managers, HR officials, and her union delegate in order to discuss Chin-McKenzie's condition and possible accommodations. *Id.* ¶ 54. As a result of this meeting, the housekeeping manager altered the cleaning schedule to avoid cleaning Chin-McKenzie's work area when she was present. *Id.* ¶ 55. LICH also arranged for Chin-McKenzie to meet with one of the hospital's allergists. *Id.* ¶ 56. After that appointment, the allergist determined that Chin-McKenzie was highly allergic to certain pollens and hazelnuts; however, the allergist did not recommend any changes in her working environment. *Id.* ¶¶ 57–58. Through January 2009, Chin-McKenzie did not demand any modifications of her work environment or routine to accommodate her condition. *Id.* ¶ 59. In January 2009, a supervisor informed Chin-McKenzie that, based on the allergist's report, LICH understood that no accommodation was necessary to enable Chin-McKenzie to function in her present environment; Chin-McKenzie did not take issue with that determination. *Id.* ¶¶ 60–61.

In June 2009, Chin-McKenzie suffered another three episodes which required her to leave work for the day and, after two episodes, to take the following day off. *Id.* ¶ 63. On July 1, 2009, LICH's HR manager convened a meeting with Chin-McKenzie, her union delegate, engineering department supervisors, and a physician apiece from the ED and EHS. There, Chin-McKenzie was asked whether she sought any accommodation to allow her to perform her job functions without a recurrence of such episodes, which had disrupted both her and her co-workers. *Id.* ¶ 65. Chin-McKenzie had no suggestions. She did, however, request a week's time to consult with her personal doctor. *Id.* ¶ 66.

On or about July 7, 2009, Chin-McKenzie submitted a letter to LICH making four requests—for (1) installation of an exhaust fan; (2) installation of an air purifier; (3) provision of data, in the form of Material Safety Data Sheets ("MSDS") for the cleaning chemicals used in her workspace; and (4) provision of MSDS for chemicals used by vendors at the hospital. *Id.* ¶ 67. On July 17, 2009, the engineering department responded, by letter.  It noted that (1) it had already provided Chin-McKenzie with an air purifier; (2) Chin-McKenzie had ignored a previous offer to move her desk closer to the window; (3) it had already furnished Chin-McKenzie with MSDS for Endust and a citrus-scented cleaner; and (4) it could not provide additional MSDS data until Chin-McKenzie specified the chemicals whose data she needed. *Id.* ¶ 68.  Chin-McKenzie never responded to the engineering department's requests for specification.  However, a ceiling exhaust fan was installed above her desk. *Id.* ¶¶ 69–70.  Chin-McKenzie did not request further accommodation.  Nor did she notify LICH that the accommodations offered were inadequate. *Id.* ¶ 71.

In the fourth quarter of 2009, Chin-McKenzie experienced five more episodes of severe allergic reactions, and missed more work. *Id.* ¶ 72.  She was instructed to undergo a fitness-for-duty examination by the EHS physician; on January 7, 2010, she was examined, after which the doctor determined preliminarily that she was not fit for duty.  Chin-McKenzie was then placed on a leave of absence, until such time as the hospital received letters from her personal doctors stating that she was fit to work. *Id.* ¶¶ 74–75, 77–79.

In January 2010, Chin-McKenzie provided LICH with a letter from her personal allergist. It recommended that she "increase protection against airborne insults with avoidance measures" and confirm that there was "no use of airborne chemicals in the workplace." *Id.* ¶ 80–81. Because of the nature of the work performed by the engineering department, however, LICH

[6]

determined that it could not guarantee either that (1) fellow employees, who commonly work with solvents and other chemicals and carry chemical odors on their clothes, would not come into contact with Chin-McKenzie, or (2) such chemicals would not reach her work area.  *Id.* ¶ 83. Accordingly, the examining EHS physician determined that Chin-McKenzie was not fit for duty in the engineering department, but could work in a different area of the hospital, in which such chemicals were not used.  *Id.* ¶ 84.

On February 17, 2010, LICH's HR director sent Chin-McKenzie a letter.  It asked her to make an appointment with another employee regarding a possible vacancy elsewhere in the hospital.  *Id.* ¶ 87.  Chin-McKenzie was offered five interviews, each for a position outside the engineering department.  However, she declined them all, insisting to LICH that any alternative position have the same shift, schedule, and salary as her dispatcher position.  *Id.* ¶ 89.  The positions for which Chin-McKenzie was offered interviews, however, were union positions. Each had job requirements and pay set by union contracts, which LICH was powerless to change unilaterally.  *Id.* ¶ 91.  After Chin-McKenzie declined these five interviews, neither she nor LICH made any further effort to find her an alternative position within the hospital.  *Id.* ¶ 92. Chin-McKenzie remains, formally, on unpaid leave.  *Id.* ¶¶ 85, 86, 93.[3]

### C.     Legal Proceedings

On April 17, 2009, Chin-McKenzie dual-filed a complaint against LICH with the Equal Employment Opportunity Commission ("EEOC") and New York State Division of Human Rights.  Marshall Aff. Ex. 6.  It alleged that Chin-McKenzie was discriminated against on the basis of disability.  *Id.* at p. 3.  It also alleged that Chin-McKenzie was retaliated against because

---

[3] LICH ceased doing business in 2011, and sold substantially all of its assets to SUNY Downstate Medical Center.  The relevance of that event to this lawsuit is unclear, and neither party has raised it as an issue.  The Court therefore assumes *arguendo* that the fact of LICH's subsequent closure does not preclude a recovery by Chin-McKenzie.

she had "file[d] a sexual harassment" complaint against her supervisor.  *Id.* at p. 4.  The complaint states that the discrimination consisted of "sexual harassment."  *Id.*  The handwritten narrative attached to the complaint did not describe the alleged sexual harassment itself.  However, it alleged "a pattern of harassment" directed at her after she complained about harassment from the supervisor.  *Id.* at p. 5.  On or about February 4, 2010, Chin-McKenzie received a "right to sue" letter from the EEOC.  It required her to file suit within 90 days.  Compl. at recitals, ECF p. 2 (Dkt. 1).

On May 2, 2010, Chin-McKenzie filed this lawsuit.  *See* Compl. at ECF p. 1.  Her Complaint asserts three claims: (1) for sexual harassment, in violation of Title VII; (2) for retaliation based on her complaint of sexual harassment, in violation of Title VII; and (3) for discrimination in employment on the basis of disability, in violation of the ADA.  *See generally* Compl.

On June 30, 2011, discovery in this case concluded.  *See* Dkt. 11.  By Order dated September 9, 2011, the Hon. Paul A. Crotty, to whom this case was previously assigned, denied Chin-McKenzie's post-discovery motion to amend the pleadings and add a cause of action.  Dkt. 16.

On January 9, 2012, defendants filed this motion for summary judgment.  Dkt. 20–27.  On February 21, 2012, plaintiff filed her opposition.  Dkt. 28–30.  On March 9, 2012, after an extension of time, defendants filed a reply.  Dkt. 32.

II.     **The Parties' Arguments**

In seeking summary judgment, defendants argue that Chin-McKenzie's sexual harassment claim is deficient because (1) she did not explicitly pursue that claim before the EEOC, and therefore failed to exhaust her administrative remedies; (2) the conduct she alleges is

not actionable sexual harassment; and (3) her claim is barred under the defense recognized in *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) (the "*Faragher/Ellerth* defense") because LICH promptly responded to her complaints, consistent with its anti-harassment policy.  As to Chin-McKenzie's retaliation claim, defendants argue that it fails because (1) the conduct Chin-McKenzie alleges does not constitute an adverse employment action under Title VII, and (2) there is no evidence that any employment action by LICH was caused by her sexual harassment complaint.  Finally, LICH argues that Chin-McKenzie's ADA claim fails because (1) Chin-McKenzie does not suffer from a disability, as defined by the ADA, and (2) she was unable to perform her essential job functions in her condition, and did not identify any reasonable accommodation which could have permitted her to do so.

In opposition, Chin-McKenzie argues that (1) she satisfactorily identified her sexual harassment claim in her administrative complaint to put LICH on notice of it; hence, it is not procedurally barred; (2) the conduct she complains of rises to the level of actionable sexual harassment; (3) the *Faragher/Ellerth* defense is unavailable to LICH, because the alleged perpetrator was a supervisor to whom she was supposed to report such harassment; (4) Chin-McKenzie's allergic reactions constitute a disability under the ADA; (5) her unpaid leave of absence was an adverse employment action; and (6) her leave of absence was caused by the sexual harassment complaint.

## III.    Applicable Legal Standard

Summary judgment may be granted only where the submissions, taken together, "show [] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the burden of demonstrating the

absence of a material factual question; in making this determination, the court must view all facts "in the light most favorable" to the non-movant. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," because "conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Only disputes over "facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In cases based on allegations of discriminatory retaliation, courts must use "an extra measure of caution" in determining whether to grant summary judgment "because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (citation omitted). However, "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000). Thus, even in such cases, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Holcomb*, 521 F.3d at 137.

## IV.    Analysis

The Court addresses defendants' motion as to each of Chin-McKenzie's claims in turn.

[10]

### A.    Chin-McKenzie's Sexual Harassment Claim

Chin-McKenzie seeks damages for sexual harassment allegedly perpetrated by a former supervisor[4] who was subsequently terminated.  Defendants assert that the sexual harassment claim is not properly before the court, that the conduct complained of does not constitute actionable harassment, and that liability is foreclosed by the *Faragher*/*Ellerth* defense.  Because the Court is unpersuaded by defendants' arguments on these points, summary judgment as to this claim is denied.

### 1.    Alleged procedural defects in Chin-McKenzie's EEOC complaint

To bring a Title VII suit in federal court, a plaintiff must first present the claims on which the suit is based to the EEOC or the equivalent state agency.  42 U.S.C. § 2000e-5.  "Exhaustion [of administrative remedies] is ordinarily an essential element of a Title VII claim."  *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.*, 274 F.3d 683, 686 (2d Cir. 2001) (internal quotation marks and additional citation omitted).  "Claims not raised in an EEOC complaint, however, may be brought in federal court if they are 'reasonably related' to the claim filed with the agency."  *Williams v. N.Y. City Hous. Auth.*, 458 F.3d 67, 70 (2d Cir. 2006) (quoting *Butts v. City of New York Dep't of Hous. Pres. & Dev.*, 990 F.2d 1397, 1401 (2d Cir. 1993)).  The Second Circuit "has recognized that '[a] claim is considered reasonably related if the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow

---

[4] Although defendants' 56.1 statement notes that the perpetrator of the sexual harassment did not hire, review, or discipline Chin-McKenzie, *see* 56.1 ¶ 27, their submissions in support of this motion do not dispute that he should be treated as Chin-McKenzie's supervisor for purposes of the Title VII analysis.  Moreover, defendants' heavy reliance on the *Faragher*/*Ellerth* defense, which applies only when the harasser is a complainant's supervisor, would undercut any such argument.  The Court therefore treats the harasser as Chin-McKenzie's supervisor for the purposes of this motion.

out of the charge that was made.'" *Williams*, 458 F.3d at 70 (quoting *Fitzgerald v. Henderson*, 251 F.3d 345, 359–60 (2d Cir. 2001)).

In assessing whether a claim is reasonably related to a prior EEOC complaint, "the focus should be 'on the factual allegations made in the [EEOC] charge itself, describing the discriminatory conduct about which a plaintiff is grieving.'" *Deravin v. Kerik*, 335 F.3d 195, 201 (2d Cir. 2003) (quoting *Freeman v. Oakland Unified Sch. Dist.*, 291 F.3d 632, 637 (9th Cir. 2002)). "'[I]t is the substance of the charge and not its label that controls.'" *Deravin*, 335 F.3d at 201 (quoting *Alonzo v. Chase Manhattan Bank, N.A.*, 25 F. Supp. 2d 455, 458 (S.D.N.Y. 1998)). "The central question is whether the complaint filed with the EEOC gave that agency 'adequate notice to investigate discrimination on both bases.'" *Williams*, 458 F.3d at 70 (quoting *Deravin*, 335 F.3d at 202). Although comparisons to other cases are instructive, "the relationship between a retaliation claim in an EEOC complaint and a subsequently-articulated gender discrimination claim . . . is . . . one intimately connected to the facts asserted in the [particular] EEOC complaint [at issue]." *Williams*, 458 F.3d at 71.

Here, although Chin-McKenzie's EEOC complaint is primarily concerned with retaliation, it does refer several times to sexual harassment. To be sure, at the beginning of the form, where asked to circle the motivating factor in the alleged discrimination, Chin-McKenzie circled "Disability" and "Retaliation for Opposing Discrimination," but not "Sex . . . Sexual Harassment." Marshall Aff. Ex. 6 at p. 3. In the questionnaire portion, however, under the heading "Description of the Discrimination," Chin-McKenzie stated that she believed she was being discriminated against because she "file[d] a sexual harassment [sic] against [the supervisor] and his wife is the VP." Marshall Aff. Ex. 6 at p. 4. In response to the next

question—"What did/does the discrimination consist of?"—Chin-McKenzie answered, "sexual harassment." *Id.*

As for the narrative portion of Chin-McKenzie's EEOC complaint, it is focused on allegations of retaliation for her complaint of sexual harassment, not the sexual harassment itself. However, Chin-McKenzie does refer to the instances of sexual harassment, albeit without chronicling them in detail. The narrative begins, "I was previously sexual harassed [sic] and reported the matter to H.R. on October 7, 2008." Marshall Aff. Ex. 6 at p. 5. It then describes the alleged retaliation for that complaint. In explaining this series of events Chin-McKenzie states that "[a]fter I reported the sexual harassment, my medical condition, allergies (anaphylaxis) became an issue." *Id.* at p. 6.

In sum, although the EEOC complaint primarily recounts the alleged *retaliation* for Chin-McKenzie's complaint of sexual harassment, as opposed to the harassment itself, Chin-McKenzie did (1) describe the prohibited discrimination directed at her as "sexual harassment," (2) refer to that harassment twice in the narrative portion of her complaint, and (3) identify by name, twice, the harassing supervisor. Although the question is fairly debatable, in the Court's view, these references gave the EEOC "adequate notice" to investigate Chin-McKenzie's underlying claim of sexual harassment. *Williams*, 458 F.3d at 70 (quoting *Deravin*, 335 F.3d at 202). Under such circumstances, and with all reasonable inferences required to be drawn in favor of Chin-McKenzie, the Court holds that her claim of sexual harassment is "reasonably related" to the claims she raised in her EEOC complaint. It is, thus, properly before the Court in this lawsuit. *See Williams*, 458 F.3d at 70.

### 2.      Defendants' argument that the conduct complained of does not constitute actionable sexual harassment

Defendants also argue that the conduct alleged by Chin-McKenzie is not sufficiently serious to create a "hostile work environment" under Title VII.[5]  Viewed most favorably to Chin-McKenzie, the record evidence reveals the following:

On May 15, 2008, the supervisor approached Chin-McKenzie, asked her to come over to him, and then said "I want to take off your draw[er]s" (*i.e.*, underwear).  Marshall Aff. Ex. 2.

On September 29, 2008, the supervisor came into Chin-McKenzie's workspace, put his hand on the back of her neck, shook her, and said "someone is going to rob and rape you, because I left the door opened [sic]." *Id.*  Thereafter, the perpetrator turned towards Chin-McKenzie's chair, said, "Oh baby" and started touching Chin-McKenzie's elbow and looking at her legs. *Id.*

Later that same day, the supervisor again approached Chin-McKenzie and stared at her. When she asked why he was looking at her in that way, he said, "I am giving you the attention that your husband is not giving you." *Id.*

Chin-McKenzie has also stated, in her complaint letter to LICH and at her deposition, that there were "other instances" where the supervisor "used inappropriate language and physical contact."  Accordingly, she asserts, by October 2008 she was "feeling uneasy about working in the same office space" as the perpetrator. *Id.*

A hostile work environment claim:

> [R]equires a showing [1] that the harassment was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," and [2] that a specific basis exists for imputing the objectionable conduct to the employer. *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir.

---

[5] Because Chin-McKenzie does not allege any "quid pro quo," her harassment claim is analyzed under the rubric of a "hostile work environment."

1997) (internal citations and quotation marks omitted).  The plaintiff must show
that the workplace was so severely permeated with discriminatory intimidation,
ridicule, and insult that the terms and conditions of her employment were thereby
altered.  *Leibovitz v. N.Y. City Transit Auth.*, 252 F.3d 179, 188 (2d Cir. 2001)
(citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)); *Brennan v.
Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999).  This test has
objective and subjective elements: the misconduct shown must be "severe or
pervasive enough to create an objectively hostile or abusive work environment,"
and the victim must also subjectively perceive that environment to be abusive.
*Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).  As a general rule, incidents
must be more than "episodic; they must be sufficiently continuous and concerted
in order to be deemed pervasive."  *Perry*, 115 F.3d at 149 (citation and internal
quotation marks omitted).  Isolated acts, unless very serious, do not meet the
threshold of severity or pervasiveness.  *Brennan*, 192 F.3d at 318; *see also
Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (noting that "we have
made it clear that conduct must be extreme to amount to a change in the terms and
conditions of employment").

*Alfano v. Costello*, 294 F.3d 365, 373–74 (2d Cir. 2002).  "The question of whether a work
environment is sufficiently hostile to violate Title VII is one of fact."  *Redd v. N.Y. State Div. of
Parole*, 678 F.3d 166, ___, 2012 U.S. App. LEXIS 9194, at *29–30 (2d Cir. 2012) (slip op.)
(citing *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 75 (2d Cir. 2001)); *see also, e.g.*, *Schiano*, 445
F.3d at 605 ("the line between boorish and inappropriate behavior and actionable sexual
harassment . . . is admittedly indistinct, [and] its haziness counsels against summary judgment")
(internal quotations omitted).

Here, the evidence adduced by Chin-McKenzie is clearly sufficient to meet the subjective
dimension of a hostile work environment claim, *i.e.*, that Chin-McKenzie found the work
environment abusive.  Further, she has personally testified to facts from which a jury could
reasonably conclude that the supervisor's course of conduct objectively constituted actionable
harassment under Title VII.  To be sure, the conduct here is more aptly described as "episodic"
than "pervasive," and it involved the actions of a single supervisor.  However, as the Second
Circuit has recognized, a small number of more serious incidents can create a hostile work

[15]

environment.  *See, e.g., Richardson v. New York State Dep't of Corr. Servs.*, 180 F.3d 426, 437 (2d Cir. 1999).  Particularly appalling here, of the 2008 incidents chronicled by Chin-McKenzie, is the one in which the supervisor approached her from behind, placed his hand on her neck, shook her, and declared that she was in danger of being raped.  This single incident, standing alone, arguably suffices to defeat defendants' motion, and viewed in combination with the supervisor's other actions as recounted by Chin-McKenzie, is sufficiently "severe" to constitute a work environment that a jury could reasonably find "hostile" or "abusive."  *Alfano*, 294 F.3d at 373.  Accordingly, the Court rejects defendants' argument that Chin-McKenzie has failed, as a matter of law, to demonstrate actionable harassment.

### 3.     *Faragher/Ellerth* defense

To prevail on a hostile work environment claim, a plaintiff must also show "that a specific basis exists for imputing the objectionable conduct to the employer."  *Alfano*, 294 F.3d at 373.  "An employer is presumptively liable for sexual harassment in violation of Title VII if the plaintiff was harassed not by a mere coworker but by someone with supervisory (or successively higher) authority over the plaintiff, although in certain circumstances an affirmative defense may be available."  *Redd*, 2012 U.S. App. LEXIS 9194, at *41 (additional citation omitted).  Where that sexual harassment "culminate[s] in a tangible employment action, such as discharge, demotion, or undesirable reassignment, the employer is held strictly liable, and [n]o affirmative defense is available."  *Id.* at *42 (citing *Ellerth*, 524 U.S. at 765) (internal quotation marks omitted) (additional citation omitted).  That, however, is not the case here, because Chin-McKenzie has not alleged any adverse employment action resulting from the harassment she has recounted.

[16]

"In the absence of a tangible employment action, the employer may avoid liability by establishing, as an affirmative defense on which it has the burden of proof, 'two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.'" *Redd*, 2012 U.S. App. LEXIS 9194, at *42 (quoting *Ellerth*, 524 U.S. at 765) (citing *Faragher*, 524 U.S. at 807–08). "An employer may demonstrate the exercise of reasonable care, required by the first element, by showing the existence of an antiharassment policy during the period of the plaintiff's employment, although that fact alone is not always dispositive." *Ferraro v. Kellwood Co.*, 440 F.3d 96, 102 (2d Cir. 2006) (citing *Mack v. Otis Elevator Co.*, 326 F.3d 116, 128 (2d Cir. 2003)) (additional citation omitted). Here, LICH has substantiated its claim that it had an anti-harassment policy in place at the time of Chin-McKenzie's alleged harassment. Indeed, it is not disputed that, pursuant to that policy, immediately after Chin-McKenzie lodged her complaint of sexual harassment, LICH initiated an investigation and, within a week, fired the perpetrator. Chin-McKenzie does not dispute either the existence or adequacy of LICH's sexual harassment policy. Thus, LICH has satisfied the first prong of the *Faragher/Ellerth* defense.

As to the second prong of the defense, however, defendants fail to show, as a matter of law, that Chin-McKenzie "unreasonably failed to take advantage" of that policy. It is undisputed that the course of harassment by the supervisor began on or before May 15, 2008. Marshall Aff. Ex. 2.[6] Chin-McKenzie did not complain about the harassing conduct until October 7, 2008,

---

[6] In Chin-McKenzie's complaint letter, she stated that "there have been several instances" in which the supervisor "used inappropriate language as well as inappropriate physical contact," and that her letter "explain[s] a few" of these episodes. Marshall Aff. Ex. 2. The earliest episode

nearly five months later.  *Id.*  That delay is significant, and a jury could certainly find it

unreasonable.  However, it is materially shorter than in other cases in which the *Faragher/Ellerth*

defense has been found to preclude relief as a matter of law at the summary judgment stage.  *See,*

*e.g.*, *Clarke v. Mount Sinai Hosp.*, No. 05-cv-566, 2007 U.S. Dist. LEXIS 101036, at *30

(E.D.N.Y. June 28, 2007) (three year delay unreasonable); *Eichler v. Am. Int'l Group, Inc.*, No.

05-cv-5167, 2007 U.S. Dist. LEXIS 23445, at *31–33 (S.D.N.Y. Mar. 23, 2007) (one year delay

unreasonable); *Schmidt v. State Univ.*, No. 02-cv-6083, 2006 U.S. Dist. LEXIS 27663, at *43–44

(E.D.N.Y. May 5, 2006) (13-month delay unreasonable); *Garone v. UPS*, 436 F. Supp. 2d 448,

466 (E.D.N.Y. 2006) (18-month delay unreasonable); *O'Dell v. Trans World Entm't Corp.*, 153

F. Supp. 2d 378, 391 (S.D.N.Y.2001) (11-month delay unreasonable), *aff'd* 40 F. App'x 628 (2d

Cir. 2002); *Dayes v. Pace Univ.*, No. 98-cv-3675, 2000 U.S. Dist. LEXIS 3698, at *16 (S.D.N.Y.

Mar. 22, 2000), *aff'd*, 2 F. App'x 204 (2d Cir. 2001) (one year delay unreasonable); *Barua v.*

*Credit Lyonnais-United States Branches*, No. 97-cv-7991, 1998 U.S. Dist. LEXIS 20338, at *4,

14 (S.D.N.Y. Dec. 30, 1998) (approximately 7 month delay between resumption of offensive

comments and complaint unreasonable).  The Court is unaware of any case holding a 5-month,

or shorter, delay in taking advantage of a sexual harassment policy to preclude liability as a

matter of law.  Furthermore, by far the most egregious harassment occurred 4–5 months after the

initial incident, which tends to mitigate Chin-McKenzie's delay in seeking relief under the

policy.

     In any event, even if LICH had shown that Chin-McKenzie failed to timely avail herself

of the policy, she would still prevail on this motion.  That is because a failure to report sexual

harassment may be excused where the employee has "a credible fear that her complaint would

---

detailed in the letter occurred on May 15, 2008, *see id.*; it is unclear whether other episodes
occurred before that date.

not be taken seriously or that she would suffer some adverse employment action as a result of filing a complaint." *Leopold v. Baccarat*, 239 F.3d 243, 246 (2d Cir. 2001). Here, the record evidence reflects that the alleged harasser's wife held a high position in the department in which Chin-McKenzie worked. *See* Marshall Aff. Ex. 2. Chin-McKenzie's October 7, 2008 complaint letter, in fact, cites that circumstance as a basis to fear reprisal. *See id.* ("I am afraid of the repercussion that is [sic] might cause, knowing that his wife is the VP of operations.") Under these circumstances, even if Chin-McKenzie had unreasonably failed to use LICH's anti-harassment policy, she has raised a triable issue of fact as to whether that failure is excused, and the *Faragher/Ellerth* defense thereby vitiated, because of her credible fear of retaliation.

For these reasons, the Court denies defendants' motion for summary judgment as to Chin-McKenzie's sexual harassment claim.

### B.      Chin-McKenzie's Retaliation Claim

In her claim of unlawful retaliation, Chin-McKenzie contends that, after she complained about sexual harassment, LICH's response to her allergic episodes became harsher, ultimately culminating in her being compelled to take a medical leave of absence. Compl. ¶¶ 24–40. Specifically, in her deposition, Chin-McKenzie faulted LICH for forcing her to document a bereavement leave (Dep. Tr. 478), denying her of some requested days off (*id.* at 457), and giving her an "average" rating on a performance review (*id.* at 422–24). Chin-McKenzie also labels as retaliation two actions applicable to other employees as well as Chin-McKenzie: announcement of a sexual harassment training session offered to all hospital employees (*id.* at 490–91), and announcement of a hospital-wide requirement that all employees receive flu shots

(*id.* at 412–18).[7]  In moving for summary judgment, LICH argues that (1) these acts, considered individually or together, are not an "adverse employment action" under Title VII; and (2) even if they were, LICH has put forth a neutral justification for them which Chin-McKenzie has failed to show is pretextual.

Under Title VII, it is unlawful for an employer to retaliate against an employee "because [s]he has opposed any practice made an unlawful employment practice by [Title VII], or because [s]he has made a charge . . . in an investigation" of conduct prohibited by Title VII."  42 U.S.C. § 2000e-3(a).  To establish a prima facie case of retaliation, a plaintiff must show:

> (1) that she participated in an activity protected by Title VII, (2) that her participation was known to her employer, (3) that her employer thereafter subjected her to a materially adverse employment action, and (4) that there was a causal connection between the protected activity and the adverse employment action.

*Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010); *Nolley v. Swiss Reinsurance Am. Corp.,* No. 10-cv-7626, 2012 U.S. Dist. LEXIS 30955, at *44 (S.D.N.Y. Mar. 8, 2012).  Once a plaintiff has made out a prima facie case of retaliation, the Court considers whether the defendant can articulate a "legitimate, non-retaliatory" reason for the allegedly-retaliatory action; and, if so, whether the plaintiff has produced evidence that the neutral justification is pretextual, *i.e.* that retaliation was, in fact, "a substantial reason" for the adverse action.  *Nolley*, 2012 U.S. Dist. LEXIS 30955, at *45 (citing *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 & 723 (2d Cir. 2010)).

---

[7] Chin-McKenzie did not list these acts in her Complaint.  They emerged, instead, during her deposition.  The Court assumes *arguendo* that these acts are properly considered.

### 1.    The alleged retaliatory acts, with one exception, are not adverse employment actions

A plaintiff sustains an adverse employment action if she endures a "materially adverse change" in the terms and conditions of employment.  *See Galabya v. NYC Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (internal quotation marks omitted).  To be "materially adverse," a change in working conditions "might be indicated by a termination of employment, . . . a material loss of benefits, . . . or other indices . . . unique to a particular situation," and must be "more disruptive than a mere inconvenience or an alteration of job responsibilities."  *Id.* (internal quotation marks omitted).  "'[P]etty slights, minor annoyances, and simple lack of good manners will not' give rise to actionable retaliation claims."  *Millea v. Metro-North R.R.*, 658 F.3d 154, 165 (2d Cir. 2011) (quoting *Ellerth*, 548 U.S. at 68).

Here, with the exception of the medical leave on which LICH put her, none of the alleged retaliatory actions that Chin-McKenzie describes meets this standard.  It is, simply, not a material adverse change in a term or condition of employment to require an employee to go to the EHS or ED after having an on-the-job allergy attack, to notify a supervisor before leaving duty, or to undergo a fitness examination.  Nor did Chin-McKenzie incur a materially adverse change in work conditions when she received an "average" performance rating, was compelled to document the reason for a bereavement leave, or was denied requested days off.[8]   These are the sort of "minor annoyances," *Millea*, 658 F.3d at 165, that do not rise to the level of actionable retaliation under Title VII.

---

[8] Chin-McKenzie does not allege that LICH interfered with any leave covered by the Family and Medical Leave Act.

**2.      As to the leave of absence, Chin-McKenzie has failed to show a causal nexus**

As to the unpaid medical leave of absence, which Chin-McKenzie was directed to take, the Court assumes *arguendo* that it is a material adverse employment action. However, Chin-McKenzie has failed to adduce evidence that it was caused by her sexual harassment complaint. That complaint was lodged in October 2008. 56.1 ¶ 20. In February 2010, LICH placed Chin-McKenzie on a medical leave of absence, after a doctor (Dr. Thazin Saw) conducted "fitness for duty" examinations of her on January 7, 2010 and February 1, 2010 and concluded that her condition made her unfit for duty. 56.1 ¶¶ 74–79. This sequence of events strongly refutes any claim that Chin-McKenzie's medical leave in 2010 was prompted by her 2008 sexual harassment complaint. And there is no record evidence that either (1) the decision to place Chin-McKenzie on a medical leave of absence was based on anything other than Dr. Saw's recommendation; (2) Dr. Saw was aware of Chin-McKenzie's earlier complaint of sexual harassment; or (3) in reaching the decision that Chin-McKenzie was unfit for duty, Dr. Saw consulted with any other LICH employee who *was* aware of the prior complaint.

It is true that, under certain circumstances, the occurrence of an adverse employment action closely following protected conduct may give rise to an inference of causation so as to make out a prima facie case. However, "courts in this Circuit have consistently held that a passage of more than two months between the protected activity and the adverse employment action does not allow for an inference of causation." *Flood v. UBS Global Asset Mgmt.*, No. 10-cv-374, 2012 U.S. Dist. LEXIS 12113, at *52 (S.D.N.Y. Feb. 1, 2012) (citing *Frisenda v. Inc. Vill. of Malverne*, 775 F. Supp. 2d 486, 512 (E.D.N.Y. 2011)); *see also Thompson v. Morris Heights Health Ctr.*, No. 09-cv-7239, 2012 U.S. Dist. LEXIS 49165, at *30 (S.D.N.Y. Apr. 6, 2012); *Williams v. Woodhull Med. & Mental Health Ctr.*, No. 10-cv-1429, 2012 U.S. Dist.

[22]

LEXIS 21645, at *7 (E.D.N.Y. Jan. 31, 2012); *Mazurkiewicz v. New York City Health & Hosps. Corp.*, No. 09-cv-5962, 2010 U.S. Dist. LEXIS 107697, at *13 (S.D.N.Y. Sept. 16, 2010).  Here, the adverse action followed the sexual harassment complaint by more than 14 months.  Chin-McKenzie has, thus, failed as a matter of law to show a causal nexus between her complaint and the medical leave of absence.

> **3.     Defendants have put forth neutral justifications for their actions which Chin-McKenzie has failed to show are pretextual**

Finally, even if Chin-McKenzie *had* made out a prima facie case of retaliation as to any allegedly-retaliatory action, judgment would still be entered in favor of defendants on this claim. That is because they have proffered neutral justifications for their actions which Chin-McKenzie has failed to show are pretextual.  Those neutral justifications are as follows.

As to the need to document a bereavement leave (Dep. Tr. 478), LICH maintains a policy permitting employees to take time off when a relative has passed away.  Salliey Decl. ¶ 5.  In March 2009, Chin-McKenzie asked for leave to mourn the passing of an aunt; in accordance with generally-applicable LICH policy, she was required to provide proof of death in seeking such leave.  *Id.* ¶ 6.  Upon providing that proof, Chin-McKenzie was granted the leave sought. *Id.*

As to the denial of some days off that Chin-McKenzie had requested (Dep. Tr. at 457) her supervisor Gambardella has averred that Chin-McKenzie was the last employee in her department to have requested those days off, and that, because at least one employee was needed to be present on those days, Chin-McKenzie's requests were denied.  Gambardella Decl. ¶ 13; Salliey Decl. ¶ 8.

As to Chin-McKenzie's receipt of a disappointing 2009 performance review (Dep. Tr. at 422–24), her immediate supervisor, Salliey, has averred that Chin-McKenzie, in fact, received an

overall rating of 3 out of 5, or "average."  There is nothing facially adverse about the review itself.  There is also absolutely no record evidence, aside from Chin-McKenzie's *ipse dixit* allegation, to support her assertion that this review resulted from her prior complaint.

As to Chin-McKenzie's receipt of a notice of a sexual harassment training session (*id.* at 490–91), her supervisor Salliey has averred—and there is no evidence to the contrary—that this training opportunity was publicized to all hospital employees.  Even if receipt of this notice of training somehow could be seen as an adverse action, there is no evidence that this action was directed specifically at Chin-McKenzie.  Salliey Decl. ¶¶ 27, 29.

As to Chin-McKenzie's complaint that she was forced to receive a flu shot (Dep. Tr. at 412–18), in September 2009 New York State mandated that all health care workers—including LICH employees—receive a flu shot in response to the H1N1 "swine flu" epidemic.  Salliey Decl. ¶ 30.  Chin-McKenzie, although required by that mandate to receive a flu shot, notified the hospital that she was allergic to one of the vaccine's ingredients, and therefore did not receive a shot.  *Id.*[9]

Finally, as to Chin-McKenzie's allegation that her allergic episodes were treated differently after her complaint of sexual harassment, under LICH's employee health services policy, the hospital was required to document, in a report, each instance in which plaintiff sought medical treatment while on the job.  Gambardella Decl. ¶ 14; Salliey Decl. ¶ 12; Gambardella Decl. Ex. B (policy).  Additionally, under that policy, when an employee becomes sick or injured, a supervisor is directed, in the normal course, to send the employee to EHS, an office staffed with a nurse and a physician on call who is designated to treat LICH employees.

---

[9] Chin-McKenzie does not assert that she was forced to actually receive the shot, only that she believes the *attempt* to compel her to receive the shot was retaliatory.

Gambardella Decl. ¶ 14.  A supervisor may, however, authorize an employee to proceed directly to the ED if either the EHS is closed, or an employee's condition is sufficiently urgent.  *Id.*

In April 2008, Chin-McKenzie had an allergic episode and went directly to the ED, bypassing the EHS.  *Id.* ¶ 15.  No report was prepared memorializing that episode.  *Id.* Dissatisfied with the care she received, Chin-McKenzie filed a complaint regarding her treatment in the ED.  *Id.*  In September 2008—a month before Chin-McKenzie's complaint of sexual harassment—a senior manager in Chin-McKenzie's department requested the report documenting the episode which had led to the ED visit.  *Id.*  Alerted that there was no report and that LICH policy was not being followed, the manager instructed Gambardella and Salliey, Chin-McKenzie's more direct supervisors, to follow LICH policy in the event of future episodes.  *Id.* Additionally, in November 2008, Chin-McKenzie left her workspace, during business hours and without informing her supervisors, because of an unwelcome scent of oranges in the vicinity of her desk.  Gambardella Decl. ¶ 18; *id.* at Ex. E.  In response, Gambardella notified Chin-McKenzie of her duty under LICH policy to, at least, notify her superiors before leaving the office during business hours.  *Id.* at Ex. E.  Thus, to the extent Chin-McKenzie complains that defendants dealt with her allergic episodes more formally after the sexual harassment complaint, such treatment was both (1) in conformance with pre-existing and generally-applicable LICH policy; and (2) precipitated by her manager's directive, which pre-dated her complaint of sexual harassment.

The events which led to her medical leave of absence are, similarly, devoid of evidence of retaliatory animus.  Between October 1, 2009 and December 14, 2009, Chin-McKenzie had no fewer than five allergic episodes while at work, with three of those episodes requiring immediate referral to the ED.  Gambardella Decl. ¶ 28.  Two episodes required her to miss additional work

days.  Salliey Decl. ¶¶ 19, 21.  As a result, in late December 2009, Chin-McKenzie was issued a letter directing her to schedule a fitness for duty examination with Dr. Saw.  *Id.* at Ex. L.

That letter states that, "[d]ue to the excessive number of visits to the Emergency Room in 2009 and the effect which this had had on the Engineering Department, and on Long Island College Hospital and upon the recommendation of the Human Resource Department, you are directed to schedule an appointment to see Dr. Thazin Saw . . . ."  *Id.*  There is no indication in the record that the decision to refer plaintiff for the examination was based on anything other than a concern for her health and legitimate concerns about the effect that her episodes were having on the engineering department.  Further, as noted, there is no basis whatsoever to conclude that Dr. Saw's findings as to the need for a medical leave of absence were influenced by Chin-McKenzie's earlier harassment claim.  Instead the uniform evidence is that they were based on Dr. Saw's clinical judgment.  There is, thus, no evidence to support a claim that the medical leave of absence was a pretext for retaliation.

Nor can Chin-McKenzie show pretext by claiming that LICH policies were selectively enforced.  *See, e.g.*, *Valenti v. Massapequa Union Free Sch. Dist.*, No. 09-cv-977, 2010 U.S. Dist. LEXIS 10076, at *21 (E.D.N.Y. Feb. 5, 2010); *Flynn v. N.Y. State Div. of Parole*, 620 F. Supp. 2d 463, 498 (S.D.N.Y. 2009).  First, there is no comparator against whose treatment Chin-McKenzie's can be judged, and thus no inference can be drawn that she was subject to selective enforcement.  She has identified no otherwise similarly-situated employee who (1) did not complain of sexual harassment, and (2) was therefore treated more favorably.  *See Burchette v. Abercrombie & Fitch Stores, Inc.*, No. 08-cv-8786, 2010 U.S. Dist. LEXIS 47043, at *23–24 (S.D.N.Y. May 10, 2010) (entering summary judgment against retaliation claim because, *inter alia*, plaintiff had not shown that other workers were treated differently).  Second, Chin-

[26]

McKenzie's own testimony supplies a good explanation for LICH's increasing attention to her condition.  As she explained, her episodes became increasingly frequent and more severe after her sexual harassment complaint:

> **Q:**  Is there an event that you can connect to the increased severity and frequency of your attacks?
> **A:**  2008 I noticed my attacks start getting worse.
> [ . . . ]
> **Q:**  So when they came early in 2008 before was there something that happened to you that made you more sensitive to the allergens?
> **A:**  Yes.
> **Q:**  What?
> **A:**  What [the supervisor] said to me.
> **Q:**  So you think [the supervisor's] sexual harassment increased the severity of your allergic reactions?
> **A:**  Yes.
> [ . . . ]
> **Q:**  Did you ever have a doctor confirm that?
> **A:**  Not that I know of.

Dep. Tr. 220–21.  Because Chin-McKenzie's condition increasingly disrupted her work and that of her department, there was a bona fide reason for LICH to intervene more vigorously, which gives rise to no inference of retaliation.

Accordingly, based on the record at summary judgment, no "fair-minded jury" could conclude that any of the alleged acts were motivated by retaliatory animus without engaging in "unsubstantiated speculation."  *Jeffreys v. City of New York*, 426 F.3d 549, 553–54 (2d Cir. 2005) (citing *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001)).  Defendants' motion as to this claim is, therefore, granted.

## C.     Chin-McKenzie's ADA Claim

Chin-McKenzie also asserts a claim under the ADA, alleging that defendants discriminated against her on the basis of a disability—her allergies.  A plaintiff alleging employment discrimination in violation of the ADA must show that: (1) the employer is subject

[27]

to the ADA; (2) the plaintiff suffers from a disability as defined in the ADA; (3) she could

perform the essential functions of her job with or without reasonable accommodation; and (4)

she suffered an adverse employment action due to the disability.  *Ryan v. Grae & Rybicki, P.C.*,

135 F.3d 867, 869–70 (2d Cir. 1998); *see also DeRosa v. Nat'l Envelope Corp.*, 595 F.3d 99, 102

(2d Cir. 2010); *Thompson v. N.Y. City Dep't of Prob.*, 348 F. App'x 643, 645 (2d Cir. 2009)

(summ. order).

      Defendants seek summary judgment against this claim on two grounds:  First, that Chin-

McKenzie's ailment does not qualify as a disability under the ADA; and, second, there was no

reasonable accommodation that would allow Chin-McKenzie to perform the functions of her

position in the engineering department, and that therefore she is not a person who "could perform

the essential functions of her job with or without reasonable accommodation."  The Court agrees

with defendants that no reasonable accommodation could permit Chin-McKenzie to perform the

essential functions of her job.  Defendants' motion is therefore granted as to the ADA claim.

      Whether a particular duty is an essential function of an identified job is based largely on

"the employer's judgment as to what functions of a job are essential"; and an employer's

identification of essential job duties is a business judgment to which "a court must give

substantial deference."  *McBride v. BIC Consumer Prod. Mfg. Co.*, 583 F.3d 92, 98 (2d Cir.

2009) (citing, *inter alia*, *Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 120 (2d Cir.

2004)).  Here, LICH has stated that the primary job duties of a dispatcher (Chin-McKenzie's

position) consisted of "answer[ing] incoming calls from throughout the Hospital reporting a

problem or requesting service"; "preparing a work order ticket and direct[ing] the work order

ticket through a computer system to the appropriate service area and engineering supervisor

based on the type of service requested"; locating "the appropriate engineer or other tradesman to

[28]

direct him or her to the area experiencing the problem"; "monitor[ing] whether the work order

tickets are completed in a timely fashion"; and interacting "with different vendors who come to

in [sic] and out of the Hospital on a daily basis to complete complex repairs and projects."

Gambardella Decl. ¶ 5.  Chin-McKenzie has not disputed that, as a dispatcher, she had these

duties.

### 1.    LICH's attempts to accommodate Chin-McKenzie's allergies

LICH attempted, in a number of ways, to accommodate Chin-McKenzie's allergies, to

allow her to perform her duties while minimizing or eliminating her exposure to allergens.  The

lengthy history of attempted accommodation is as follows.

On November 7, 2008, Chin-McKenzie suffered a severe allergic episode which

compelled her to visit the ED.  Gambardella Decl. ¶ 16.  On November 10, 2008, LICH's HR

department asked the engineering department whether Chin-McKenzie's workspace could be

moved to a different location in light of her allergies.  *Id.* ¶ 17.  On November 12, 2008,

Gambardella e-mailed various officials at LICH, including representatives from HR, the director

of LICH's environmental services department, and the director of labor relations.  *Id.* ¶ 19 & Ex.

F.  HR recommended that, before exploring accommodations, LICH first gain a more thorough

understanding of Chin-McKenzie's condition.  *Id.* at Ex. G.

On December 4, 2008, Chin-McKenzie met with her union representative, Gambardella,

and an HR representative to discuss her condition.  *Id.* ¶ 20.  At that meeting, Chin-McKenzie

stated that her own allergist was not available for an appointment until January 2009; LICH

stated that the situation was urgent, and recommended that she see an allergist at LICH.  *Id.* at

Ex. H.  She did so.

[29]

On January 7, 2009, after the LICH allergist had examined Chin-McKenzie, Gambardella wrote her a memorandum memorializing the allergist's conclusions.  Gambardella wrote that "it is our understanding that the allergist concluded that your allergy condition poses no threat to your normal working environment."  *Id.* at Ex. I.  Gambardella added, "in conclusion, we find no need for any further accommodations to this matter and we expect that you will be able to function in your present working environment."  *Id.*  However, Gambardella noted, although "there is no need for any further consideration regarding your work environment, [] we are still prepared to allow you to apply for another suitable vacant position for which you are qualified at this time."  *Id.*  Chin-McKenzie disputed neither the allergist's clinical assessment, nor LICH's conclusion that she did not need any accommodation to function in her workplace.  *Id.* ¶ 20.

In June 2009, Chin-McKenzie suffered yet another series of episodes.  *Id.* ¶ 21.  On July 1, 2009, another meeting was convened with, *inter alia*, Chin-McKenzie, Gambardella, an HR representative, the labor relations manager, the doctor in charge of the ED, and Chin-McKenzie's union representative, to discuss possible accommodations.  *Id.* ¶ 22.  At that meeting, Chin-McKenzie did not propose any accommodations.  HR suggested that Chin-McKenzie consult with her personal physician and report any suggestions.  *Id.*

On July 7, 2009, Chin-McKenzie submitted a letter requesting accommodations:  (1) an exhaust fan near her desk; (2) an air purifier; (3) MSDS data on cleaning agents used in Engineering; and (4) MSDS data on chemicals used by outside vendors.  *Id.* ¶ 23 & Ex. J.  On July 16, 2009, the hospital responded by memorandum.  It noted that Chin-McKenzie had already been provided an air purifier near her desk, which she frequently did not turn on, and had not responded to an offer to move her desk nearer to the window, and MSDS for chemicals used in the engineering department had already been provided, but the hospital would provide MSDS

for other chemicals upon request.  The hospital also requested clarification as to the vendors'
chemicals for which she sought MSDS.  *Id.* ¶¶ 23, 25–27 & Ex. K.[10]  LICH located an exhaust
fan and installed it above Chin-McKenzie's desk.  *Id.* ¶ 24.

Between October and mid-December 2009, Chin-McKenzie suffered an additional five
episodes at work, leading to the fitness for duty examination with Dr. Saw.  *Id.* ¶ 28.  Dr. Saw's
examination pronounced Chin-McKenzie unfit for duty, and therefore not permitted to return to
work, unless specifically cleared for duty by her personal allergist and primary care physician.
*Id.* ¶ 29.  Thereafter, Chin-McKenzie submitted a letter from her allergist which stated that Chin-
McKenzie could perform her job if the hospital could "verify no use of airborne chemicals in
[the] workplace."  *Id.* ¶ 30.  However, the engineering department—which oversees the
hospital's maintenance and repairs—stated that it could not guarantee such an environment.  It
explained that its employees commonly work with chemicals and, while bearing the scent of
chemicals on their clothing or tools, may enter the office for purposes including receiving
assignments from the dispatcher (Chin-McKenzie).  *Id.* ¶ 30.  Also problematic, the hospital's
environmental services department—which is responsible for cleaning the entire hospital
complex, and which housed all of the cleaning chemicals used throughout the hospital—was
situated next to the engineering department.  *Id.*  Chin-McKenzie would commonly walk by or
through that department when entering or exiting her workspace.  *Id.*  In sum, given the factors,
LICH simply could not guarantee that Chin-McKenzie, were she to remain in her current
position, would not be exposed to allergens.

However, to accommodate Chin-McKenzie, HR offered her the opportunity to interview
for additional positions outside the engineering department, in which LICH *could* guarantee a

---

[10] Chin-McKenzie did not respond to these requests for clarification.  *Id.* ¶¶ 26–27.

chemical-free environment.  Karp Decl. ¶ 10.  On February 17, 2010, HR sent Chin-McKenzie a

letter notifying her that LICH's recruiting department would assist her in finding another such

position at the hospital for which she was qualified.  *Id.* ¶ 10 & Ex. E.  Two weeks later, Chin-

McKenzie sent a letter to a recruiting assistant, copying HR.  Chin-McKenzie noted her current

work hours and rate of pay, and stated that she "will not accept a lesser job."  *Id.* at Ex. F.

On February 25, 2010, Chin-McKenzie met with the recruiting department, which

identified four positions for which she was qualified.  *Id.* ¶ 11.  Chin-McKenzie initially declined

to interview for any of these positions.  *Id.*  On March 7, 2010, however, she advised HR that she

would interview for a patient services representative position, so long as she was guaranteed her

current pay.  *Id.* ¶ 11 & Ex. G.  However, as LICH represented, that position is a union job, with

wages and pay grades set by a collective bargaining agreement.  *Id.* ¶ 11.  As a result, neither HR

nor the recruiting department could alter the pay rate for that position, and LICH could not meet

Chin-McKenzie's demand as to pay.  *Id.*  On March 10, 2009, the recruiting department advised

Chin-McKenzie that it had located another vacant position.  However, she again declined to

interview for it, stating that it "does not meet my requirements stated in my previous emails

pertaining to hours."  *Id.* at Ex. H.  Chin-McKenzie did not thereafter identify any position in

which she was interested.  Instead, she told the recruiting department:  "[i]t is your responsibility

to find a suitable job replacement for me . . . ."  *Id.*

## 2.      Whether LICH's accommodation efforts satisfied the ADA

"In the context of the ADA, reasonable accommodation may include, *inter alia*,

modification of job duties and schedules, alteration of the facilities in which a job is performed,

acquisition of devices to assist the performance of job duties, and, under certain circumstances,

'reassignment to a vacant position.'"  *McBride*, 583 F.3d at 97 (quoting 42 U.S.C. §

12111(9)(B)) (additional citations omitted).  "The plaintiff bears the burdens of both production

and persuasion as to the existence of some accommodation that would allow her to perform the

essential functions of her employment, including the existence of a vacant position for which she

is qualified."  *McBride*, 583 F.3d at 97 (citing *Jackan v. N.Y. State Dep't of Labor*, 205 F.3d 562,

566–67 (2d Cir. 2000)).

      Here, the record evidence clearly demonstrates that Chin-McKenzie could not perform

the essential functions of her position without some form of accommodation.  Without

accommodation, she was subject to allergic episodes which rendered her chronically absent from

her position for considerable periods of time.  And Chin-McKenzie has not identified a

reasonable accommodation which would have permitted her to perform her essential job

functions, but which LICH failed to provide.  The record instead indicates that LICH vigorously

attempted to identify means of accommodating Chin-McKenzie's condition, and was

commendably attentive to her predicament.  Chin-McKenzie does note that "[t]he requested air

purifier and fan were items of accommodation that were not onerous to an institution of the

stature of LICH and were quite reasonable in cost and size."  Chin-McKenzie Br. 11.  However,

LICH undisputedly *did* provide Chin-McKenzie with *both* an air purifier *and* a fan.  Chin-

McKenzie therefore has not met her burden to identify a concrete reasonable accommodation

that LICH failed to implement.[11]

---

[11] Revealingly, Chin-McKenzie does not argue to this Court that LICH could have
accommodated her by providing an engineering department job in an environment totally free of
airborne chemicals.  And any such proposal would be unrealistic under the circumstances.  Chin-
McKenzie's primary job function—interacting with the hospital's engineers—necessarily
involved personal contact with employees who work with chemicals and solvents.  It cannot be
assured that these workers always will be chemical-free when they interact with her.  *See, e.g.*,
*Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 140 (2d Cir. 1995) ("an employer is not
required to accommodate an individual with a disability by eliminating essential functions from
the job").

Nor has Chin-McKenzie provided any evidence of an alternative position for which she was qualified and which LICH denied her.  On the contrary, she rejected out of hand the five positions LICH identified for her.  Chin-McKenzie has, thus, failed to carry her burden on this point as well.

Nor can Chin-McKenzie tenably claim that LICH failed to provide her with, as the ADA contemplates, "'an interactive process by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated.'"  *Thompson*, 348 F. App'x at 645 (quoting *Jackan*, 205 F.3d at 566).  The record, in fact, forcefully shows that LICH employed just such a process.  A team of LICH officials drawn from across the medical and administrative spectrum met with Chin-McKenzie twice to discuss her ongoing and worsening condition.  And, after it became clear that LICH could not guarantee non-exposure to allergens in the engineering department, LICH assigned a recruiting assistant to find other suitable employment for her within the hospital system.  Two LICH doctors examined Chin-McKenzie to understand better her condition and to assess whether that condition rendered her unfit for duty in the engineering department.  Further, each time Chin-McKenzie raised questions about LICH's approach to her predicament, the hospital answered quickly.

In sum, Chin-McKenzie has failed to substantiate her claim that LICH either (1) could have provided her with a reasonable accommodation for her disability; or (2) failed to provide her with a suitable alternative position.  Accordingly, defendants' motion for summary judgment as to the ADA claim is granted as well.

### D.    Chin-McKenzie's Claims Against Continuum

Defendants also seek dismissal of Chin-McKenzie's claims against defendant Continuum because it was not her employer.  It is undisputed that LICH was Chin-McKenzie's direct

[34]

employer.  It hired her, issued her paychecks, and issued her annual W-2 forms.  Karp Decl. Ex.

K.  Continuum, by contrast, is a network of several hospitals in New York City, including LICH,

Beth Israel Medical Center, and St. Luke's Roosevelt Hospital Center.  Werner Decl. ¶ 1.

Generally, "a corporate entity is liable for the acts of a separate, related entity only under

extraordinary circumstances."  *Murray v. Miner*, 74 F.3d 402, 404 (2d Cir. 1996).  "[T]he law

only treats the employees of a corporate entity as the employees of a related entity under

extraordinary circumstances."  *Id.*  There is an exception to this rule, known as the "single

employer doctrine."  It applies where there are "sufficient indicia of an interrelationship between

the immediate corporate employer and the affiliated corporation to justify the belief on the part

of an aggrieved employee that the affiliated corporation is jointly responsible for the acts of the

immediate employer."  *Schade v. Coty, Inc.*, No. 00-cv-1568, 2001 U.S. Dist. LEXIS 8440, at

*18 (S.D.N.Y. June 25, 2001) (citing, *inter alia*, *Herman v. Blockbuster Entm't Grp.*, 18 F. Supp.

2d 304, 308 (S.D.N.Y. 1998), *aff'd*, 182 F.3d 899 (2d Cir.), *cert. denied*, 528 U.S. 1020 (1999));

*see also Ruhling v. Tribune Co.*, No. 04-cv-2430, 2007 U.S. Dist. LEXIS 116, at *15 (E.D.N.Y.

Jan. 3, 2007); *Gagliardi v. Universal Outdoor Holdings, Inc.*, 137 F. Supp. 2d 374, 378

(S.D.N.Y. 2001).

Under the analysis governing claims that an affiliated corporation should be held liable as

an "employer" under Title VII, "[a] parent and subsidiary cannot be found to represent a single,

integrated enterprise in the absence of evidence of (1) interrelation of operations, (2) centralized

control of labor relations, (3) common management, and (4) common ownership or financial

control."  *Schade*, 2001 U.S. Dist. LEXIS 8440, at *19 (citing *Cook v. Arrowsmith Shelburne,*

*Inc.*, 69 F.3d 1235, 1240 (2d Cir. 1995)); *see also Olsson v. Vertis Commc'ns*, No. 09-cv-5428,

2009 U.S. Dist. LEXIS 121633, at *4 (S.D.N.Y. Dec. 29, 2009); *Snyder v. Advest, Inc.*, No. 06-

cv-1426, 2008 U.S. Dist. LEXIS 80862, at *18–19 (S.D.N.Y. Oct. 8, 2008). In Title VII cases, the focus is on the second factor, with the most decisive question being: "What entity made the final decisions regarding employment matters related to the person claiming discrimination?" *Fried v. LVI Servs.*, No. 10-cv-9308, 2011 U.S. Dist. LEXIS 57639, at *10 (S.D.N.Y. May 23, 2011) (citing *Cook*, 69 F.3d at 1240).

Here, Chin-McKenzie has offered no evidence whatsoever of this. She has not adduced any evidence that LICH and Continuum are sufficiently interrelated that LICH's employees are properly deemed employees of Continuum, thereby exposing Continuum to liability for LICH's labor and employment practices. Accordingly, defendants' motion to dismiss all claims against Continuum is granted as well.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted with respect to all claims in this case except for Chin-McKenzie's sexual harassment claim against LICH, which survives. The parties are directed to appear at a conference on July 20, 2012 at 2:00 pm in Courtroom 18C of the United States Courthouse, 500 Pearl Street, New York, NY 10007 to set a date for trial, and dates for the parties' pretrial submissions.

Counsel are further directed, prior to that date, to meet and confer about the prospect for settling this matter, in light of the Court's dismissal of various of Chin-McKenzie's claims.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: June 29, 2012
       New York, New York

[36]